IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | **Redacted – Public Version** |
| | ) | |
| v. | ) | C.A. No. 22-1345-CJB |
| | ) | |
| TVISION INSIGHTS, INC., | ) | ████████████████ |
| | ) | |
| Defendant. | ) | |

## OPPOSITION OF TVISION INSIGHTS, INC. TO
## PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant TVision Insights, Inc.*

OF COUNSEL:
Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

Eric C. Cohen
RIMÔN LAW P.C.
P.O. Box B113
150 Fayetteville St, Suite 2800
Raleigh, NC 27601-2960
(984) 960-2860

Michael F. Heafey
RIMÔN LAW P.C.
800 Oak Grove Avenue, Suite 250
Menlo Park, CA 94025
(650) 461-4433

Dated: December 19, 2023

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................... 1

   A.    Nature & State of Proceeding ............................................................................. 1

   B.    Summary of Argument ........................................................................................ 1

II.   COUNTER-STATEMENT OF THE FACTS ........................................................... 2

III.  ARGUMENT ............................................................................................................ 3

   A.    Legal Standard .................................................................................................... 3

   B.    TVision Has Alleged Two Types of Agreements That Violate Sherman Act § 1—Tying Agreements and the Nielsen/Gracenote Agreement ..................................... 4

      1.    Legal Principles Involving Sherman Act § 1 Allegations of Unlawful Tying Agreements ............................................................................................................ 5

      2.    Nielsen's Prohibitions Against Customers Using TVision's Attention Technology Data Are Tying Agreements ................................................................ 5

      3.    Nielsen's Unlawful Tying Agreements Unreasonably Restrain Trade by Harming Both TVision and Nielsen's Customers ................................................... 7

   C.    Nielsen's Refusal to Renew TVision's License to use the Gracenote ACR Software Violates Sherman Act Section 1, or alternatively, Section 2 ................................ 8

   D.    TVision Has Plausibly Alleged That Nielsen Violated Section 2 of the Sherman Act 11

      1.    TVision has Alleged Monopoly Power .............................................. 12

      2.    TVision Pleads Improper Exclusionary Conduct That Violates Section 2 of the Sherman Act ................................................................................................... 14

      3.    TVision's Enforcement of the Fraudulently Obtained '243 Patent Violates Sherman Act § 2 .................................................................................................. 14

      4.    TVision Pleads Sufficient Facts Demonstrating Sham Litigation ........................ 15

   E.    TVision Plausibly Alleges That Nielsen Violated Section 2 of the Sherman Act By Attempted Monopolization ............................................................................. 17

   F.    TVision States A Claim For Tortious Interference .................................................. 18

   G.    TVision has adequately pleaded unjust enrichment. ................................................ 19

   H.    Dismissal With Prejudice Is Not Appropriate ........................................................ 20

IV.   CONCLUSION ..................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen-Myland, Inc. v. International Business Machines Corp.*,
    33 F.3d 194 (3d Cir. 1994) ........................................................................... 5

*Arnold Chevrolet LLC v. Tribune Co.*,
    418 F. Supp. 2d 172 (E.D.N.Y. 2006) ...................................................... 10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................... 3

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*
    472 U.S. 585 (1985) ............................................................................... *passim*

*Avaya Inc. v. Telecom Labs, Inc.*,
    838 F.3d 354 (3rd Cir. 2016) ............................................................. 5, 8, 14

*Azurity Pharm. v. BionPharm.*,
    650 F. Supp. 3d 269 (D. Del., Jan 11, 2023) ........................................... 15

*BAE Systems Information and Electronic Systems Integration, Inc. v.
    Lockheed Martin Corp.*,
    2009 WL 264088 (D. Del. Feb. 3, 2009) ............................................. 19, 20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................... 3

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007) ......................................................... 11, 12, 13

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) .................................................................................... 12

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) .................................................................................. 5, 9

*Enzo Life Sciences, Inc. v. Digene Corp.*,
    295 F.Supp.2d 424 (D. Del. 2003) ....................................................... 18, 19

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
    658 F.2d 139 (3d Cir. 1981) ......................................................................... 6

*FTC v. Facebook, Inc.*,
    560 F. Supp. 3d 1 (D.D.C. 2021) .............................................................. 13

*In re Google Digital Advert. Antitrust Litig.*,
    2021 WL 2021990 (N.D. Cal. May 13, 2021) ........................................... 13

*H.J., Inc. v. Int'l Tel. & Tel. Corp.*,
    867 F.2d 1531 1549 (8th Cir. 1989) ........................................................ 10

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
    806 F.3d 162 (3d Cir. 2015) ...................................................................... 16

*Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed.Cir.2011) (en banc) .................................................. 16

*Itiowe v. U.S. Gov't*,
    553 F. App'x 271 (3d Cir. 2014) .............................................................. 19

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) .................................................................................. 7, 8

*Jersey Asparagus Farms, Inc. v. Rutgers Univ.*,
    803 F. Supp. 2d 295 (D.N.J. 2011) .......................................................... 13

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) ...................................................................... 9

*In re Lipitor Antitrust Litig.*,
    855 F.3d 126 (3d Cir. 2017) ...................................................................... 14

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951) ................................................................................... 9

*Northern Pacific Ry. Co. v. United States*,
    356 U.S. 1 (1958) ...................................................................................... 5

*Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
    886 F.3d 332 (3d Cir. 2018) ............................................................... 10, 11

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ...................................................................... 12

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ................................................................................. 14

*In re Suboxone Antitrust Litig.*,
    2017 WL 4642285 (E.D. Pa., Oct. 17, 2017) ........................................... 10

*Sysmex Corporation et al v. Beckman Coulter, Inc.*,
    C.A. No. 19-1642-GBW-CJB, D.I. 301 (D. Del. June 11, 2021) (Ex. C) ........ 20

*Talley v. Christiana Care Health Sys.*,
    2018 WL 4938566 (D. Del. Oct. 11, 2018) .............................................. 13

*TC Tech. LLC v. Sprint Corp.*,
    2019 WL 529678 (D. Del. Feb. 11, 2019) ................................................ 20

*The Nielsen Company (US) LLC v. TVision Insights, Inc.*,
  C.A. Nos. 21-1592 (D. Del., filed Nov. 10, 2021) ...................................................... 10, 11

*Thomson Reuters Enterprise Centre GmbH v. ROSS Intelligence Inc.*,
  2022 WL 1224903 (D. Del., April 26, 2022) (Stark, J.) ..................................................... 5

*TransWeb, LLC v. 3M Innovative Properties Co.*,
  812 F.3d 1295 (Fed. Cir. 2016) ................................................................................... *passim*

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919) .......................................................................................................... 7, 8

*United States v. Dentsply*,
  399 F.3d 181 (3d Cir. 2005) ................................................................................................. 9

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ........................................................................................................... 12

*Verizon Comm'n Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) .......................................................................................................... 6, 7

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010) ................................................................................................... 9

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
  382 U.S. 172 (1965) ............................................................................................ 14, 15, 16, 17

*Wilkerson v. New Media Tech. Charter Sch. Inc.*,
  522 F.3d 315 (3d Cir. 2008) ................................................................................................. 4

*You Map, Inc. v. Snap, Inc.*,
  2021 WL 106498 (D. Del. Jan 12, 2021) ........................................................................... 19

**Statutes**

15 U.S.C. § 18 ....................................................................................................................... 12

15 USC § 15b ........................................................................................................................ 11

Sherman Act § 1 ............................................................................................................ *passim*

Sherman Act § 2 ............................................................................................................ *passim*

Telecommunications Act of 1996 ........................................................................................... 6

**Other Authorities**

Cambridge Dictionary ............................................................................................................. 3

Fed. R. Civ. P. 11(b)(3) ......................................................................................................... 18

Fed. R. Civ. P. 15(a)(2) ......................................................................................................... 20

## I.  INTRODUCTION

### A.  Nature & State of Proceeding

In this case, Plaintiff Nielsen alleges that Defendant TVision infringes U.S. Patent No. 11,470,243 ("the '243 patent").  This Court has previously denied Nielsen's motion to strike TVision's affirmative defense that the '243 patent was obtained through inequitable conduct. D.I. 49. TVision filed a counterclaim, alleging *inter alia* that Nielsen has violated Sherman Act §§ 1 and 2, based in part on the same facts alleged in its inequitable conduct affirmative defense. D.I. 68. This brief responds to Nielsen's motion to dismiss TVision's counterclaim. D.I. 77.

### B.  Summary of Argument

1.  As is demonstrated in section III B, below, TVision states a claim under Sherman Act § 1 with respect to Nielsen's new tying agreements with customers that permit them to use Nielsen's data only on condition that they refrain from using TVision's data, or pay substantial surcharges for using TVision's data.   Nielsen's new customer agreements have the anticompetitive effect of substantially diminishing the market for TVision's data; substantially reducing the market for data sold by TVision's customers, who compete directly with Nielsen; and substantially reducing the ability of Nielsen's customers to use TVision's unique attention technology data, which provides information that Nielsen's data does not. This includes data about just how closely viewers are paying attention to the program or commercial that Nielsen's customers are attempting to value.   Nielsen's argument that the Counterclaim does not adequately plead that Nielsen has market power sidesteps the Counterclaim's allegations that Nielsen has 100% of the relevant market of providing ratings for linear TV.  *See* section II, below.

2.  TVision also states a claim under Sherman Act § 2, either as monopolization or as an attempt to monopolize.  First, Nielsen's tying arrangements constitute violations of Sherman Act § 2.  *See* section III.C–E, below.  TVision pleads that Nielsen has 100% of the market, and

through its market power has monopolized or attempted to monopolize the market for ratings "currency" by (a) forcing its customers into tying agreements that prohibit them from using TVision's data; (b) refusing to renew TVision's Gracenote license to ACR technology, which was immune from Nielsen's patent infringement lawsuits, and then subjecting TVision to a series of sham patent infringement lawsuits, including the present lawsuit in which Nielsen has attempted to enforce a fraudulently obtained patent, which itself is a § 2 violation under the circumstances of this case.

3.   TVision states claims of tortious interference and unjust enrichment, as set forth in sections III.F and III.G, below.

## II.  STATEMENT OF FACTS

The Counterclaim alleges that the relevant product and/or service markets ("Relevant Market") comprises data obtained from media audience measurement systems to provide "ratings" to approximate the number of people watching a television program, other media or advertisements and/or the sale or license of such data to advertisers and media providers.  D.I. 68, Counterclaim ¶ 6.  The Counterclaim further defines the Relevant Submarket as audience measurement systems for obtaining exposure data for a media exposure environment, including devices equipped with software to perform such measurements and collect data; and the submarket for data collected by such systems. *Id.* ¶ 7.

The Counterclaim alleges facts establishing that Nielsen has monopoly power in that market. D.I. 68 at 9-15 (alleging that since 1993, Nielsen "effectively has been the sole provider of television ratings" (*id.* ¶9); that Nielsen "held a monopoly on TV viewership and ratings numbers for decades" (*id.* ¶ 13); that Nielsen "still holds a monopoly on" various types of media audience measurement systems and data obtained from those systems (*id.* ¶ 14); and that

2

"[t]here are few, if any, competitors to Nielsen in this Relevant Market" (*id.* ¶ 15)).[1] Nielsen argues that TVision has plead inconsistently because it denied that Nielsen is the industry's "***leading***" data and analytics company." D.I. 77 at 2. But "leading" is a loaded word that means "most important." *See* Ex. B (Cambridge Dictionary definition of "leading"). It does not mean "monopolist."

TVision, on the other hand, is a data and analytics company that provides a system that measures *how* people watch media and ads. TVision developed a new and more accurate way to measure whether viewers were paying attention to ads or media ("TVision's attention technology'). D.I. 68 ¶ 18. Nielsen does not track "who is paying attention." "TVision has sold its data reports to customers who compete with Nielsen, such as VideoAmp and iSpot." D.I 68 ¶ 21. As is discussed below, the Counterclaim alleges that Nielsen engaged in a series of anticompetitive acts to attempt to put TVision out of business, and its damages expert confirms many of TVision's allegations.

### III. ARGUMENT

#### A. Legal Standard

Surviving a motion to dismiss requires "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The complaint must state enough facts to raise a reasonable

---

[1] In a report served on October 25, 2023 in case no. 22-cv-057, 12 days after TVision filed its counterclaim in this case, Nielsen's damages expert, Michael Keeley, characterized Nielsen as                                                    REDACTED


Keeley Rept. ¶ 30, Ex. A. If this court were to find TVision's counterclaim failed to adequately plead monopoly power in the relevant market, it could do so in an amended complaint based on Mr. Keeley's report.

expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch. Inc*., 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted). The standard for pleading each individual claim for relief is discussed in the sections, below.

### B. TVision Has Alleged Two Types of Agreements That Violate Sherman Act § 1—Tying Agreements and the Nielsen/Gracenote Agreement

TVision has alleged that Nielsen has added new prohibitions to its customer agreements that prohibit Nielsen's customers from using TVision's attention technology data with Nielsen's data, or charge those customers substantial additional amounts for doing so. D.I. 68, Ccl. ¶¶ 25, 26. Those new provisions are unlawful tying agreements that violate Sherman Act § 1 because they restrain trade unreasonably. TVision's Counterclaim pleads that Nielsen has a monopoly in the relevant market for providing "ratings" of TV shows, advertising, or other media (collectively "Media"). D.I. 68 Ccl. ¶¶ 6-8. It also pleads that there are two components that Nielsen uses to provide ratings: (1) audience measurement systems that determine who is watching Media, and (2) data generated from such measurement systems to customers, such as TV stations, advertisers, etc. *Id.* ¶¶ 9-12. "Nielsen has 'held a monopoly on TV viewership and ratings numbers for decades'" and "When it comes to national television audience measurement used for the buying and selling of commercial time, Nielsen has long been an industry-rated monopoly." *Id.* ¶ 13 (citing sources).[2]

TVision is in the business of collecting Panel Data using a system that more accurately measures whether viewers are actually paying attention to ads or Media ("TVision's attention

---

[2] Audience measurement systems include "Panel" hardware devices and associated software located in households that detect household members and guests who are watching Media. *Id.* ¶ 16. Data collected by Panel devices ("Panel Data") is combined with Census Data (the data collected from Smart TVs or set top boxes). Automatic Content Recognition ("ACR") is a system to match audio (e.g. from a TV program or commercial) against an "fingerprint" or "signature" to determine the exact ad or program that the viewer is watching. *Id.* ¶ 17.

technology"). *Id.* ¶ 18. TVision's attention technology has become "the 'go-to-choice' for Nielsen's measurement rivals," such as VideoAmp and iSpot. *Id.* ¶¶ 19.

### 1. Legal Principles Involving Sherman Act § 1 Allegations of Unlawful Tying Agreements

A tying arrangement "violates § 1 of the Sherman Act if the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992) (citation omitted). "[A] tying arrangement may be defined as an agreement by a party to sell one product [or service] but only on the condition that the buyer also purchases a different (or tied) product [or service], or at least agrees that he will not purchase that product [or service] from any other supplier." *Northern Pacific Ry. Co. v. United States* , 356 U.S. 1, 5–6 (1958). "Tying can support a Sherman Act claim either under § 1, as an unlawful restraint on trade, or under § 2, as an unlawful act of monopolization or attempted monopolization." *Avaya Inc. v. Telecom Labs, Inc*., 838 F.3d 354, 397 (3rd Cir. 2016).

### 2. Nielsen's Prohibitions Against Customers Using TVision's Attention Technology Data Are Tying Agreements

Here, TVision alleges that Nielsen uses its market power to coerce its customers to agree not to mingle the data they purchase from Nielsen with data originating from TVision. D.I. 68, Ccl. ¶¶ 25, 26. This is a classic tying agreement. Nielsen's agreements with its customers can constitute contracts for purposes of a section 1 allegation involving a tying arrangement. *See Allen-Myland, Inc. v. International Business Machines Corp.,* 33 F.3d 194 (3d Cir. 1994) (IBM agreements with customers implementing a pricing policy in which installation labor was bundled in with the price of parts were sufficient to constitute agreements for purposes of a section 1 tying claim); *see also*, *Thomson Reuters Enterprise Centre GmbH v. ROSS Intelligence Inc.*, 2022 WL 1224903 at *4, *6 (D. Del., April 26, 2022) (Stark, J.) (denying motion to dismiss antitrust counterclaim alleging that owners of Westlaw unlawfully

tied its legal search tool to their public law database to maintain their dominance in the overall market for legal search platforms).

This is not a case where Nielsen is "merely charging customers a fee for certain uses or limited rights." D.I. 77 at 6. Thus, Nielsen misplaces its reliance on *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 147-148 (3d Cir. 1981), which is not analogous on its facts. In *Fleer*, Topps had negotiated a licenses Major League Baseball Players Association (MLBPA) and its players for the rights to market baseball cards. The Third Circuit held that Topps' exclusive licensing agreements did not restrain trade unreasonably. This case is different. Nielsen's new agreements with customers are pure tying agreements: they condition the use of Nielsen's data on the customer not using TVision's data, or paying extra to use TVision's data. Requiring non-use or an extra payment for use of TVision's attention data is anticompetitive because the purpose of it is to dissuade Nielsen's customers from using TVision's attention technology data which, in turn, has the effect of diminishing the market for TVision's product. TVision provides "attention technology" data that Nielsen does not provide. D.I. 77 Ccl. ¶¶ 19-21. Combining Nielsen's data and TVision's data is a significant advantage for Nielsen's customers. There is no business justification for Nielsen to prohibit its customers from using TVision's attention technology data, since the combination of both sets of data is an advantage for Nielsen's customers.

The cases cited by Nielsen on page 6 of its brief are inapposite. *Verizon Comm'n Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) involved the Telecommunications Act of 1996, which is not at issue here. Verizon entered into a consent order, and thereafter was sued by a customer law firm, alleging that Verizon had filed filled rivals' orders on a discriminatory basis in order to suppress competition. The issue in *Verizon* was whether Verizon's alleged denial of interconnection services violated section 2 of the Sherman Act. *Id.* at 407. In *Verizon*, the Court distinguished *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*

472 U.S. 585, 601 (1985) on the ground that the complaint in *Verizon* did not allege that Verizon

had voluntarily engaged in a course of dealing with its rivals. *Id.* at 409.  Here, in contrast,

Nielsen had engaged in a course of dealing with its customers in which it had not prohibited

them from using non-Nielsen data along with data from other sources.  So, this case is more

like *Aspen*, where the Court found a violation of the antitrust laws after a jury trial, where the

Court reasoned "[t]he jury may well have concluded that [the defendant] elected to forego these

short-run benefits because it was more interested in reducing competition . . . over the long run

by harming its smaller competitor." *Aspen,* 472 U.S. at 608.  Further, in *Verizon*, "the services

allegedly withheld are not otherwise marketed or available to the public. The sharing obligation

imposed by the 1996 Act created "something brand new". *Verizon*, 540 U.S. at 410.  Also

inapposite is *United States v. Colgate & Co.*, 250 U.S. 300 (1919), where an indictment alleged

that a manufacturer's circulation of price lists to its dealers, which the dealers were not forced

to follow, constituted unlawful price fixing.

### 3.   Nielsen's Unlawful Tying Agreements Unreasonably Restrain Trade by Harming Both TVision and Nielsen's Customers

Nielsen relies on exclusive dealing cases for the proposition that a restraint must

"foreclose enough of a market to threaten competition in it." D.I. 77 at 7.  The agreements at

issue here are unlawful tying arrangements.

> [W]e have condemned tying arrangements when the seller has some
> special ability—usually called "market power"—to force a purchaser
> to do something that he would not do in a competitive market. * * *
> When "forcing occurs, our cases have found the tying arrangement to
> be unlawful.  * * * *[I]f that power is used to impair competition on
> the merits in another market, a potentially inferior product may be
> insulated from competitive pressures.*  This impairment could either
> harm existing competitors or create barriers to entry of new
> competitors in the market for the tied product.

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984) (emphasis added), *partially

abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

Thus, "a plaintiff in a tying case [must] prove that the defendant has market power sufficient

'to force a purchaser to do something that he would not do in a competitive market.'" *Avaya Inc.*, 858 F.3d at 403, quoting *Jefferson Parish*, 466 U.S. at 14.  In this case, it logically follows that Nielsen's new restrictions on the use of TVision's data harm Nielsen's customers by forcing them not to use TVision's improved attention technology data, which provides an additional audience metric and enhances the audience data that Nielsen provides.  Nielsen's power to force its customers causes them to use an inferior product because they can't take advantage of TVision's unique attention technology ratings which provide further insight into audience behavior that Nielsen itself cannot provide.  Nielsen can do this only due to its market power.

### C.  Nielsen's Refusal to Renew TVision's License to use the Gracenote ACR Software Violates Sherman Act Section 1, or alternatively, Section 2

Gracenote was an independent company that licensed TVision to use Gracenote's ACR software. *Id.* ¶23.  Presumably, Gracenote licensed its ACR software because it was profitable for Gracenote to do so.  Nielsen then acquired Gracenote, giving Nielsen the power to potentially eliminate a competitor by refusing to renew TVision's license, and then serially filing several sham patent infringement lawsuits against TVision and its licensor ACRCloud after TVision incurred substantial expense to license new ACR software from ACRCloud. D.I. 68 Ccl. ¶¶ 23-25, 29-36.

Nielsen's acquisition of Gracenote, and the steps it took afterwards, violated the Sherman Act.  Although the Sherman Act generally "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal," *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919), the general rule has exceptions, including a duty to deal under the circumstances presented in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600-01 (1985).  Further, "'[a]nticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all

8

the varieties.'" *LePage's Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003). Examples of agreements that may constitute anticompetitive conduct under Section 2 include conspiracies to exclude a rival, *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109 (3d Cir. 2010), exclusive dealing arrangements, *United States v. Dentsply*, 399 F.3d 181, 187 (3d Cir. 2005), and tying agreements, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992).

In *Aspen*, owners of different ski mountains combined to offer "All Aspen" tickets to four ski mountains skiers. The owner of three of the mountains then decided to discontinue 4 mountain ticket and offer a three-mountain ticket to the three mountains it owned, leaving the fourth mountain out in the cold. As a result, the fourth mountain's business declined. Under those circumstances, the Supreme Court affirmed a jury verdict finding that the defendant's termination of the arrangement was anticompetitive and violated Section 2. The Court cited *Lorain Journal Co. v. United States,* 342 U.S. 143 (1951) in which a local newspaper that had a monopoly over the mass dissemination of all news and advertising in its area, in an effort to destroy a small radio station that competed with it for advertising, had refused to sell advertising to persons that patronized the radio station. The Court held that the newspaper's conduct violated § 2 of the Sherman Act. In *Aspen* the Court observed that "the right of a monopolist to deal with whom he pleases is not so narrow that it encompasses no more than the circumstances of *Lorain Journal*." The Court emphasized in *Aspen* that the "monopolist elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years" that was not justified by any normal business purpose. 472 U.S. at 603, 608. So too, here, Gracenote had established a pattern of licensing TVision to use its ACR software. At that point in time, TVision was a fledgling company, barely in the business of offering a better measurement of audience perception of

programming and advertisements than Nielsen provides.[3]  Thus, Nielsen was motivated by the

desire to squelch competition when it denied TVision the right to renew the license.  Looking

at Nielsen's "conduct taken as a whole rather than considering each aspect in isolation," as this

court must, *Phila. Taxi*, 886 F.3d at 339, Nielsen's agreement to acquire Gracenote itself was

anticompetitive, given Nielsen's' monopoly position to begin with.  The acquisition enabled

Nielsen to obtain an ACR technology not covered by any of Nielsen's patents, which Gracenote

had licensed to TVision, which then subjected TVision to a series of baseless patent litigation

cases over its newly licensed ACR software.  As Nielsen's damages expert put it, REDACTED

                                                                        Keeley Expert Report

at 42, ¶ 88 (Ex. A.)

At page 12 of its brief, Nielsen argues that "Gracenote's conduct may not be imputed

to Nielsen because TVision provides no facts to support its conclusory allegation that ***Nielsen***

'caused' Gracenote's refusal to renew."  D.I. 77 at 12.  This, however, is properly the subject of

discovery.  Under *Aspen*, TVision should be entitled to determine whether it was Nielsen who

directed its wholly owned subsidiary not to renew the license.  In that regard, *In re Suboxone*

*Antitrust Litig.*, 2017 WL 4642285 at *7 (E.D. Pa., Oct. 17, 2017), cited by Nielsen on page 13

of its brief[4]  supports TVision's position because it states that a section 2 claim brought against

a  parent  corporation  based  on  anticompetitive  activity  is  sufficient  "if  there  are  factual

---

[3] As Nielsen's damages expert has explained,                    REDACTED

Keeley Damages Report, at 42-43, ¶ 88 (Ex. A).

[4] Some of the cases Nielsen cites at pages 13-14 hold that there is no liability against the
parent unless "it performed acts sufficient to create liability or actively influenced the
subsidiary," *H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531 1549 (8th Cir. 1989); *Arnold
Chevrolet LLC v. Tribune Co.*, 418 F. Supp. 2d 172, 178 (E.D.N.Y. 2006) (same). That is what
TVision has alleged here. Nielsen's other cases are inapposite on their facts because the
allegations were characterized as "conclusory."

allegations showing . . . independent conduct on behalf of the parent." That is exactly what is pleaded here: "After the acquisition, Nielsen caused Gracenote to refuse to renew TVision's license . . . ." D.I. 68, Ccl. ¶ 24.

There is no merit to Nielsen's attempt to exclude TVision's allegations regarding the cancellation of the Gracenote license on statute of limitations grounds under the circumstances of this case.  *See* 15 USC § 15b.  "To determine whether conduct is anticompetitive, 'courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation.'" *See Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc*., 886 F.3d 332, 339 (3d Cir. 2018) (quoting *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (en banc)).The major injury to TVision by Gracenote's refusal to license TVision is that it made TVision vulnerable to being serially sued by Nielsen for patent infringement, which Nielsen could not have done had Gracenote continued to license TVision.  That injury did not occur until 2021, when Nielsen filed the first of what are now five baseless lawsuits against TVision and its ACR licensor.[5] Moreover, it is one of a pattern of anticompetitive conduct engaged in by Nielsen, attempting to force TVision out of the market.

### D.  TVision Has Plausibly Alleged That Nielsen Violated Section 2 of the Sherman Act

"Liability under § 2 [of the Sherman Act] requires (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Broadcom Corp. v. Qualcomm Inc*., 501 F.3d 297, 306-07 (3d Cir. 2007) (quoting *United States v. Grinnell Corp*., 384 U.S. 563, 570-71 (1966)). The second element is also known as "anticompetitive conduct." *Id*. at 308.

---

[5] *The Nielsen Company (US) LLC v. TVision Insights, Inc*., C.A. Nos. 21-1592 (D. Del., filed Nov. 10, 2021); 22-57 (D. Del., filed Jan. 14, 2022); 22-1345 (D. Del., filed Oct. 12, 2022); 23-1346 (D. Del., filed Nov. 22, 2023); 23-1346 (D.Del., filed Nov. 22, 2023).

### 1.  TVision has Alleged Monopoly Power

Contrary to Nielsen's argument at pages 9 and 10 of its brief, TVision's counterclaim is replete with allegations that Nielsen has monopoly power.  The Counterclaim pleads, "Since 1993 Nielsen effectively has been the sole provider of television ratings." D.I. 68, Ccl. ¶ 9. This allegation, alone, is sufficient to plead that Nielsen has a monopoly in the market for television ratings.  Nielsen's reliance on *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) is misplaced. First, *Brown Shoe*, was a case brought under Clayton Act §7, which prohibits the acquisition of a competitor where the effect would be to substantially lessen competition. 15 U.S.C. § 18.  *Brown Shoe* involved a merger between the third and eighth largest shoe companies in the U.S. *Id.* at 297.  Unlike this case, *Brown Shoe* did not involve a motion to dismiss.

The Supreme Court has defined monopoly power as "the power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (quoting *United States v. E. I. du Pont De Nemours & Co.*, 351 U.S. 377, 391 (1956)). The existence of monopoly power in a relevant market may be proven "through direct evidence of supracompetitive prices and restricted output." *Broadcom*, 501 F.3d at 307. Alternatively, monopoly power may be inferred from indirect evidence, where the plaintiff shows that a defendant "has a dominant share in a relevant market, and that significant 'entry barriers' protect that market." *Broadcom*, 501 F.3d at 307 (citing *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380-81 (3d Cir. 2005)).  Section 2 plaintiffs who take the indirect route bear the burden of defining a "relevant market." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). "Competing products are in the same market if they are readily substitutable for one another; a market's outer boundaries are determined by the reasonable interchangeability of use between a product and its substitute, or by their cross-elasticity of demand." *Broadcom*, 501 F.3d at 308.

In this case, it is clear from the complaint that the relevant geographic market is the United States. D.I. 68, Ccl. ¶¶ 8, 9.  And the pleading of monopoly power in the market for television ratings could not be clearer.  The Counterclaim pleads that Nielsen is a "predominant supplier of television . . . 'ratings'" and that "Nielsen's widely recognized monopoly is . . . national in scope and thus encompasses . . . national ratings used for nationwide network broadcast" *Id.* ¶ 9.  "Nielsen has 'held a monopoly on TV viewership and ratings numbers for decades.'" *Id.* ¶ 13.  "'When it comes to national television audience measurement used for the buying and selling of commercial time, Nielsen has long been an industry-mandated monopoly.'" *Id.*  "Nielsen has held and still holds a monopoly on (a) media audience measurement systems; (b) data obtained from media audience measurement systems; (3) the sale or license of date obtained from media audience measurement systems; or (d) devices and software used for media audience measurement systems." *"Id.* ¶ 15.  The foregoing allegations are more than sufficient to plausibly allege that Nielsen has monopoly power in the relevant market.  In this regard, this case is distinguishable on its facts from the cases cited by Nielsen at page 10 of its brief.[6]

---

[6] *In re Google Digital Advert. Antitrust Litig.,* 2021 WL 2021990, at *3 (N.D. Cal. May 13, 2021)*; FTC v. Facebook, Inc.,* 560 F. Supp. 3d 1, 4 (D.D.C. 2021); *Jersey Asparagus Farms, Inc. v. Rutgers Univ.,* 803 F. Supp. 2d 295, 313 (D.N.J. 2011) ("A plaintiff must allege cross elasticity of consumer demand because 'the outer boundaries of a relevant market are determined by reasonable interchangeability of use.'"); *Talley v. Christiana Care Health Sys.,* 2018 WL 4938566, at *7–9 (D. Del. Oct. 11, 2018).  *Google* is inapposite because the plaintiff there conceded that an amended complaint would "address only the claims of digital advertisers, not publishers." *Jersey* is distinguishable because the court in dicta noted that the relevant market there was for asparagus, and the alleged monopolization involved only "Rutgers" varieties, but not non-Rutgers varieties.  *Id.* at 313. Here, there is no issue of cross-elasticity for Nielsen's ratings information. In *Facebook*, the court concluded that the allegations plausibly defined a relevant market, but failed to plead market power in a case where "the market at issue here is unusual." *Id.* at 17.  *Facebook* thus dealt with unique facts and is inapplicable here. In *Talley*, a gynecologist sued the teaching hospital which had suspended her after she had a verbal altercation.  The discussion of monopoly power in that case does not inform the issues presented in this case.

### 2. TVision Pleads Improper Exclusionary Conduct That Violates Section 2 of the Sherman Act

Contrary to Nielsen's arguments at pages 11-15, TVision's Counterclaim pleads violations of Sherman Act § 2.  First, as discussed above in sections III.B.2 and 3, Nielsen's "anti-commingling provisions of Nielsen's contracts with its customers" constitute unlawful tying agreements, that not only violate Sherman Act § 1, but also Sherman Act § 2.  *Avaya*, 838 F.3d at 397.  Those agreements violate § 2 because they foreclose TVision's customers from using additional audience measurements that Nielsen does not provide to give TVision's customers better insight into viewer behavior than they would have by solely using Nielsen's data.  In short, Nielsen does not measure audience attentiveness to programming; TVision does.

### 3. TVision's Enforcement of the Fraudulently Obtained '243 Patent Violates Sherman Act § 2

Ignoring the allegations that Nielsen is a monopolist (Ccl. ¶¶ 9-16), Nielsen argues that its attempt to enforce a fraudulently procured patent against TVision—a small company—does not amount to monopolization under § 2.  The "maintenance and enforcement of a patent obtained by fraud on the Patent Office may be the basis of an action under § 2 of the Sherman Act." *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp*., 382 U.S. 172, 173 (1965). The party asserting the Walker Process claim must show that "the patentee committed fraud before the PTO, that the fraud caused the patent to issue, and that the patentee enforced the fraudulently procured patent." *In re Lipitor Antitrust Litig*., 855 F.3d 126, 145 (3d Cir. 2017) (internal citation omitted); *see also TransWeb, LLC v. 3M Innovative Properties Co*., 812 F.3d 1295, 1306 (Fed. Cir. 2016). The party asserting the Walker Process claim must also establish the other elements of a Sherman Act monopolization claim: (1) engagement in predatory or anticompetitive conduct, (2) specific intent to monopolize, and (3) "a dangerous probability of achieving monopoly power." S*pectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

14

The issue is not, as Nielsen argues, whether the '243 patent gives Nielsen monopoly power—Nielsen has that already.  Ccl. ¶¶ 9-16.  The issue, rather, is the monopolist's misuse of the judicial system to assert an obviously fraudulently obtained patent against a much smaller company, thus causing TVision to expend scarce resources unnecessarily in the form of litigation expenses.  *See TransWeb, LLC v. 3M Innovative Properties Co*., 812 F.3d 1295 (Fed. Cir. 2016) (district court awarded attorneys' fees defending patent infringement claim as antitrust damages in a *Walker Process* antitrust counterclaim, finding that those attorneys' fees constituted "an antitrust injury"); *Azurity Pharm. v. BionPharm.*, 650 F. Supp. 3d 269, 281-82 (D. Del., Jan 11, 2023) (denying motion to dismiss). "[I]t is the abuse of the legal process by the antitrust-defendant that makes the attorney fees incurred by the antitrust-plaintiff during that legal process a relevant antitrust injury." *TransWeb*, 812 F.3d at 1312 (emphasis in original). The Federal Circuit explained its rationale for treating attorney fees as an antitrust injury as follows:

> [T]he patentee instigated an anticompetitive suit that forced the defendant to choose between ceasing competition, taking a disadvantageous position in competition (taking a license), or defending the suit. Because the injury suffered by the antitrust-plaintiff under each choice flows from the anticompetitive aspect of the patent owner's behavior, each can be recovered as antitrust damages.

*Id*. at 1310.

### 4.  TVision Pleads Sufficient Facts Demonstrating Sham Litigation

TVision pleads that Nielsen embarked on a campaign of serially filing baseless patent infringement lawsuits against TVision to divert TVision's scarce resources  . . . ."  D.I. 68, Ccl. ¶ 29.  The Counterclaim lists each of the baseless lawsuits that Nielsen has filed, including this one, in which Nielsen asserts a patent obtained by fraud.  *Id.* ¶¶ 30-36.  In *Azurity*, this District sustained a sham litigation claim on a motion to dismiss where, as here, the plaintiff had serially filed patent infringement lawsuits:

15

> Here, Azurity filed seven lawsuits over the same generic product and has not pointed to anything in the Hatch-Waxman Act that endorses such a practice. For these reasons, Bionpharma has plausibly alleged that Azurity filed its seven lawsuits to interfere with competition in enalapril liquids through means other than eventual success on the merits. Whether that was Azurity's actual motivation remains an issue for factual development.

*Id.* In *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc*., 806 F.3d 162 (3d Cir. 2015), the Third Circuit held that allegations of serially filing multiple lawsuits would more easily overcome *Noerr-Pennington* immunity than filing a single lawsuit. 806 F.3d at 180. It explained that, "[w]here there is only one alleged sham petition, [*PRE* ]'s exacting two-step test properly places a heavy thumb on the scale in favor of the defendant." Id. at 180. "In contrast, a more flexible standard is appropriate when dealing with a pattern of petitioning." *Id*. Thus, the Third Circuit asks "whether a series of petitions were filed with or without regard to merit and for the purpose of using the governmental process (as opposed to the outcome of that process) to harm a market rival and restrain trade." *Id*. To determine whether a practice of petitioning the government without regard to merit was used, "a court should perform a holistic review that may include looking at the defendant's filing success—i.e., win-loss percentage—as circumstantial evidence of the defendant's subjective motivations." *Id*.

The serial manner in which Nielsen has sued TVision raises an inference that Nielsen is engaged in a campaign of "throw it up against the wall to see if it sticks" to drive up TVision's litigation costs for the purpose of driving TVision out of the market and eliminating competition by VideoAmp and iSpot. Nielsen dismissed the first lawsuit because it could not prove infringement. TVision contends that Nielsen will lose the second lawsuit for the same reason. In this lawsuit, this Court has denied Nielsen's motion to strike TVision's inequitable counterclaims. D.I. 49. "After *Therasense* [*Inc. v. Becton, Dickinson & Co*., 649 F.3d 1276, 1290 (Fed.Cir.2011) (en banc)], the showing required for proving inequitable conduct and the showing required for proving the fraud component of *Walker Process* liability may be nearly

16

identical." *TransWeb.* 812 F.3d at 1307.   Indeed, in *TransWeb* the Court stated that an inequitable conduct showing "proves the first *Walker Process* requirement, as well as elements (1) and (2) of the second *Walker Process* requirement." 812 F.3d at 1307.  Those elements are "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Id.* at 1306.  In this case, not only has the Counterclaim pleaded that Nielsen has filed serial lawsuits against TVision, but it has also pleaded that one of them is based on a fraudulently obtained patent.  Thus, the Counterclaim adequately pleads sham litigation.

### E.  TVision Plausibly Alleges That Nielsen Violated Section 2 of the Sherman Act By Attempted Monopolization

As has been demonstrated above, TVision has amply pleaded attempted monopolization under Sherman Act § 2.  TVision agrees with Nielsen's formulation of the elements as recited on page 16 of its brief, which match the elements set forth above necessary to plead attempted monopolization based on *Walker Process* fraud: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *TransWeb*, 812 F.3d at 1306.

There is no merit to Nielsen's specious argument that "TVision has failed to identify a single act or practice that it alleges to be predatory conduct."  D.I. 77 at 16. Nielsen's argument is meritless because (a) this Court has denied Nielsen's motion to strike TVision's inequitable conduct counterclaim in this case (D.I. 49); (b) TVision's well-pleaded inequitable conduct counterclaim suffices to plead *Walker Process* fraud, *TransWeb,* 812 F.3d at 1307; and (c) TVision's well-pled inequitable conduct allegations "along with [Nielsen] bringing the infringement suit proves the first *Walker Process* requirement, as well as elements (1) and (2) of the second *Walker Process* requirement." 812 F.3d at 1307. Nielsen's argument also lacks merit with respect to allegations. Nielsen's tying agreements that prevent its customers from using TVision's data in addition to Nielsen's data constitute section 2 violations.  And its refusal

17

to renew TVision's license to use Gracenote's ACR software enabled Nielsen to file a string of baseless lawsuits.

There is no merit to Nielsen's contention that "TVision has failed to plead any facts supporting a specific intent to monopolize." D.I. 77 at 16.  In *TransWeb*, the Court stated that an inequitable conduct showing is sufficient, alone, to establish an intent to monopolize.  *See* 812 F.3d at 1306-07. Nor is there any merit to Nielsen's argument that "there are no allegations in the Counterclaim that there is a dangerous probability that a market will be monopolized." D.I. 77 at 16. Paragraph 103 of the Counterclaim pleads, "Because of Nielsen's existing monopoly in the relevant market, there is a dangerous probability that Nielsen will achieve further monopoly power in the relevant market through the anticompetitive acts set forth above." D.I. 68, Ccl. § 103.

### F.  TVision States A Claim For Tortious Interference

TVision has pleaded, among other things, that Nielsen has prohibited its customers from using TVision's data without paying Nielsen a surcharge. D.I. 68 ¶¶26-28.  Construing all well-pleaded facts in the light most favorable to TVision, it must be inferred that Nielsen knew that its customers were contracting with TVision and sought to prevent it with the restrictive clauses in its tying agreement.  There is no merit to Nielsen's argument in footnote 12 to the effect that TVision's allegations should be ignored because they are "on information and belief."  D.I. 77 at 17, n. 12.  Of course, the allegations are "on information and belief." This form of pleading is permitted under Fed. R. Civ. P. 11(b)(3) ("the factual allegations . . . will likely have evidentiary support after a reasonable opportunity for . . . discovery"). In *Enzo Life Sciences, Inc. v. Digene Corp.*, 295 F.Supp.2d 424 (D. Del. 2003), the Court denied a motion to dismiss a tortious interference claim similar to the one TVision filed in this case.  The Court applied the standard for proving tortious interference as follows: "(1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the

interferer; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted." *Id.* at 429. In that case, the defendant counterclaimed that it "had a valid business relationship or expectancy in connection" with its products; that the plaintiff had knowledge of such relationship; that the plaintiff "intentionally interfered with [defendant's] relationship or expectancy"; that the defendant had suffered damages including lost sales and profits. *Id.* at 429. The Court held that the defendant had sufficiently pled its tortious interference counterclaim sufficiently to withstand a motion to dismiss. *Id.* at 429-430. TVision's pleadings in this case are far more robust than they were in *Enzo*.[7] Delaware courts have held that to plead a reasonable probability of a business relationship, the plaintiff may plead facts that "allow the court to 'reasonably infer that specific parties were involved.'" *You Map, Inc. v. Snap, Inc.,* 2021 WL 106498 at *9 (D. Del. Jan 12, 2021), *report & recommendation adopted*, 2021 WL 327388 (D. Del Feb. 1, 2021).

### G. TVision has adequately pleaded unjust enrichment.

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience." *BAE Systems Information and Electronic Systems Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088 at *6 (D. Del. Feb. 3, 2009). In order to recover on

---

[7] Here, TVision has pleaded that Nielsen used its monopoly power to force its customers to enter into tying agreements foreclosing them from using TVision's data; (D.I. 68 Ccl. ¶¶ 26-28. ); Nielsen knew about TVision's contracts with VideoAmp and iSpot, and of their agreements with customers; (*Id.* ¶¶108-111); "Nielsen changed its agreements with its customers, some of whom are also customers of VideoAmp and iSpot, to preclude those customers from using data provided by TVision," and that "certain customers have either not signed agreements with VideoAmp or iSpot, not renewed agreements with VideoAmp or iSpot, or terminated agreements with VideoAmp or iSpot, all of which have damaged TVision" and that "Nielsen's change in its agreements was a significant factor causing such non-signing, non-renewal or termination of such . . . agreements." (*Id.* ¶¶111-113). Under any metric, this is more than sufficient to plead tortious interference. There is no merit to Nielsen's reliance on *Itiowe v. U.S. Gov't*, 553 F. App'x 271, 272 (3d Cir. 2014). In that case, the plaintiff filed a case alleging injuries to her brother, not to her.

a claim of unjust enrichment, a plaintiff must prove: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Id.* at *7. In this case, Nielsen has forced its customers into tying agreements that have precluded those customers from using data provided by TVision. This conduct has enriched Nielsen and impoverished TVision. There is no justification for Nielsen's prohibition on the use of TVision data. And the law does not provide a direct remedy for TVision. Thus, TVision recites a plausible claim for unjust enrichment.

### H.  Dismissal With Prejudice Is Not Appropriate

There is no merit to Nielsen's argument that this case be dismissed with prejudice. Under Fed. R. Civ. P. 15(a)(2), this Court "should freely give leave [to amend] when justice so requires." TVision timely amended its pleading in accordance with the scheduling order in this case. As TVision has demonstrated, it can amend it further based on new information if this Court should find that the allegations in TVision's counterclaim were insufficient. Good cause exists to amend, given the statements in Nielsen's damages expert's report. *E.g., TC Tech. LLC v. Sprint Corp.,* 2019 WL 529678, at *2 (D. Del. Feb. 11, 2019); *Sysmex Corporation et al v. Beckman Coulter, Inc.*, C.A. No. 19-1642-GBW-CJB, D.I. 301 (D. Del. June 11, 2021) (permitting amendment of a counterclaim after the deadline to amend, following grant of a motion to dismiss, and noting that "where the Defendant first attempted to file its . . . counterclaim by the pleading deadline (albeit unsuccessfully) and where it timely pursued additional relevant information that it included in its proposed amended counterclaim--the Court cannot say that Defendant was not diligent, nor that it unduly delayed.") (Ex. C).

### IV. CONCLUSION

For the reasons set forth above, TVision respectfully requests that the Court deny Nielsen's motion to dismiss TVision's counterclaim. If the Court grants the motion, TVision requests the Court do so without prejudice and permit TVision to amend its counterclaim.

Respectfully submitted,

/s/ Nathan R. Hoeschen
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
Attorneys for Defendant TVision Insights, Inc.

OF COUNSEL:
Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

Eric C. Cohen
RIMÔN LAW P.C.
P.O. Box B113
150 Fayetteville St, Suite 2800
Raleigh, NC 27601-2960
(984) 960-2860

Michael F. Heafey
RIMÔN LAW P.C.
800 Oak Grove Avenue, Suite 250
Menlo Park, CA 94025
(650) 461-4433

Dated: December 19, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2023, this document was served on the persons

listed below in the manner indicated:

**BY EMAIL:**

David E. Moore
Andrew L. Brown
Bindu A. Palapura
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
(302) 984-6000
dmoore@potteranderson.com
abrown@potteranderson.com
bpalapura@potteranderson.com

Clifford Katz
Malavika Rao
Jolie Brett Schenerman
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800
ckatz@kelleydrye.com
mrao@kelleydrye.com
jschenerman@kelleydrye.com

Steven Yovits
Constantine Koutsoubas
Mel W. Gaddy
Jason P. Greenhut
Douglas Lewis
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
(312) 857-7070
syovits@kelleydrye.com
ckoutsoubas@kelleydrye.com
mgaddy@kelleydrye.com
jgreenhut@kelleydrye.com
dlewis@kelleydrye.com

Joshua B. Long
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd. Suite 900
Houston, TX 77027
(713) 355-5054
jlong@kelleydrye.com

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

# Exhibit A

*The Nielsen Company (US), LLC*

*v.*

*TVision Insights, Inc.*

U.S. District Court for the District of Delaware
Case No. 22-057-LPS

# Expert Report on Damages

## Michael C. Keeley, Ph.D.
## Senior Advisor, Cornerstone Research

## October 25, 2023

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

28.                    REDACTED

29.                    REDACTED

---

23      REDACTED

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

REDACTED

---

REDACTED

REDACTED

---
REDACTED

REDACTED

---
REDACTED

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

REDACTED

---

REDACTED

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

## X.   SIGNATURE

REDACTED

Michael C. Keeley, Ph.D.

# Exhibit B



*Meaning of **leading** in English*

# leading

***adjective*** [ before noun ]

US  /ˈliː.dɪŋ/   UK  /ˈliː.dɪŋ/

<span>Add to word list</span>

**B2**

## very important or most important:

• *a leading **expert** on the country's ecology*

• *the world's leading manufacturer of audio equipment*

**— Fewer examples**
  • *He has established himself as the leading candidate in the election.*
  • *Jaqueline du Pré was a leading exponent of cello-playing.*
  • *Our products compare favorably with all the leading brands.*
  • *She heads one of Britain's leading travel firms.*
  • *She's the country's leading mezzo-soprano.*

**+ SMART Vocabulary: related words and phrases**

# leading

***noun*** [ U ]   UK

US  /ˈled.ɪŋ/   UK  /ˈled.ɪŋ/

Contents

To top

12/19/23, 1:34 AM
Case 1:22-cv-01345-CJB   Document 82   Filed 12/27/23   Page 38 of 41 PageID #: 1204
leading | English meaning - Cambridge Dictionary

 Cambridge Dictionary   

➕ **SMART Vocabulary: related words and phrases**

*(Definition of **leading** from the **Cambridge Advanced Learner's Dictionary & Thesaurus** © Cambridge University Press)*

**leading** | INTERMEDIATE ENGLISH

# leading

*adjective*

US 🔊 / ˈli·dɪŋ /

Add to word list ☰

**first or most important:**

• *She is a leading expert on the art of ancient Greece.*

*(Definition of **leading** from the **Cambridge Academic Content Dictionary** © Cambridge University Press)*

**leading** | BUSINESS ENGLISH

# leading

*adjective* [ before noun ]

UK 🔊 / ˈli·dɪŋ / US 🔊

Add to word list ☰

**best, most important, or most successful:**

• **a leading brand/brand name** *The cereal is sold under several leading brand names.*

• **a leading business/company/firm** *Investors can buy shares in many of the world's leading companies in other parts of the world.*

• **a leading producer/provider/supplier** *The software has helped the company become the world's leading producer of kit airplanes.*

*(Definition of **leading** from the **Cambridge Business English Dictionary** © Cambridge University Press)*

**What is the pronunciation of *leading*?**  ❯

# Exhibit C

CLOSED,CASREF,Multi-Media Docs,PATENT

RECAP Actions

## U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:19-cv-01642-GBW-CJB

Sysmex Corporation et al v. Beckman Coulter, Inc.
Assigned to: Judge Gregory B. Williams
Referred to: Judge Christopher J. Burke
Cause: 35:271 Patent Infringement

Date Filed: 09/03/2019
Date Terminated: 10/14/2022
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 06/11/2021 | 301 | ORAL ORDER: The Court, having considered Defendant's motion for leave to file an amended counterclaim for inequitable conduct, ("Motion"), (D.I. 268), having reviewed the parties' letter briefs relating thereto, (D.I. 269; D.I. 278; D.I. 288), and having heard argument on June 8, 2021, hereby ORDERS that the Motion is GRANTED for the reasons that follow: (1) Federal Rule of Civil Procedure 16(b)(4)'s good cause standard has been met here. Defendant first filed a pleading that included a counterclaim and affirmative defense of inequitable conduct by the October 1, 2020 deadline for amended pleadings. (D.I. 118; D.I. 119; see also D.I. 269 at 1) Plaintiffs thereafter filed a motion to dismiss the counterclaim and affirmative defense. (D.I. 134) The Court found that Defendant had not sufficiently pleaded inequitable conduct, and required Defendant to file a motion for leave to file an amended counterclaim should it wish to shore up its inequitable conduct allegations. (D.I. 250; D.I. 273) That is the present Motion before the Court. (2) In response to the Motion, Plaintiffs do not address futility; instead they argue that good cause is lacking (and/or, per Federal Rule of Civil Procedure 15, that undue delay and unfair prejudice are afoot), because Defendant had all the information alleged in its proposed amended counterclaim prior to the October 1, 2020 deadline. (D.I. 278) However, Defendant's proposed amended counterclaim newly alleges that named inventor Mr. Narisada engaged in inequitable conduct, and it bolsters that argument in part based on timely-sought deposition testimony from Mr. Narisada, which Defendant obtained on March 10, 2021. (D.I. 269 at 3; D.I. 288 at 2) Although Plaintiffs point to an interrogatory response and privilege log entries that purportedly conveyed the same information about Mr. Narisadas role well before March 2021, the Court is not persuaded that these documents demonstrated the extent of Mr. Narisada's involvement with the XE-2100 body fluid application. (D.I. 288 at 2) Under these circumstancesi.e., where the Defendant first attempted to file its inequitable conduct counterclaim by the pleading deadline (albeit unsuccessfully) and where it timely pursued additional relevant information that it included in its proposed amended counterclaim--the Court cannot say that Defendant was not diligent, nor that it unduly delayed. Cf. Enzo Life Scis., Inc. v. Digene Corp., 270 F. Supp. 2d 484, 488-89 (D. Del. 2003); (3) Moreover, Plaintiffs make no substantive argument (i.e., one that discusses in real detail the contours of still-needed discovery, or the extent of the filings impact on the case schedule) that explains why permitting Defendants proposed amended pleading would prejudice Plaintiffs by throwing the current case schedule off course. (D.I. 278 at 5); and (4) Accordingly, Defendant is directed to file its amended pleading on the docket by no later than June 14, 2021, but the amended pleading shall not contain the proposed additional counts relating to alleged violations of the Illinois protective order (counts that were the subject of a separate |

motion to amend that the Court has denied). (D.I. 296; see also D.I. 278 at 1 n.1). Ordered by Judge Christopher J. Burke on 6/11/2021. (dlb) (Entered: 06/11/2021)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/19/2023 10:28:54 | | | |
| **PACER Login:** | js9634kk | **Client Code:** | 10439.01 AER |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cv-01642-GBW-CJB Start date: 1/1/1975 End date: 12/19/2023 Starting with document: 301 Ending with document: 301 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |